Chief Justice Robertson
delivered the Opinion of the Court.
In the year 1832, Aleck, a boy of color, claiming to be free in consequence of the last will of Cloe Pen, published and admitted to record in the spring of the year 1813—filed a bill in chancery against Samuel Tevis (who holds him as a slave,) praying for a decree establishing his freedom and liberating him from servitude.
Tevis insists that Aleck did not belong to Cloe Pen, but was the property of her husband, who, as he says, died in Maryland, about the year 1809, and from whom his wife had eloped to Kentucky, about the year 1806, bringing with her, without his consent, the mother of Aleck, who was since born in this state; and he alleges, also, that, though Aleck was, in fact, liberated, and had actually enjoyed the privileges of a free man, from early in the year 1813 to some time in September, 1818, yet, not doubting himself that he was the slave of the representatives of Mrs. Pen’s husband, and believing that he, as well as others in the same condition, would be enslaved by some speculating purchaser, he (Tevis) bought him, and those others, in 1818, from those representa, tives, for a price greatly disproportionate to their value, for the purpose of liberating some of them; and that, accordingly, he had since emancipated as many of them as he could consistently with his own indemnity for his purchase.
It was admitted, that the person nominated as the executor of Mrs. Pen’s will had never been qualified as such, but had assented to the emancipation of Aleck and others, and told them, shortly after the death of the testatrix, that they might go whithersoever they pleased; and it was also admitted, that the representatives under *243 whom Tevis, in his own right, claims, did not know that those persons of color had been liberated or claimed to be free.
Depositions.
Bill dismissed» and questions to be decided.
Anex’ormay assent to a legacy, even before probate; and where he has assented to the emancipation of, or has waived his authority over, a slave, freed by the will, the personal representative of the emancipator is not a necessary party to the bill of the slave for freedom A court of equity has jurisdiction, concurrent with a court of law, of the suitbro’t by a person unlawfully held in bondage, to establish and secure his right to freedom; aswhere a colored person has been emancipated, but is still detained, or reduced again to slavery; more especially, where, him—as to whicli, he is entitled to the proceeds of liis labor accrued to the party detaining such party is a trustee: the trust alone would give the jurisdiction. a married wobrings slaves to them^er^untii after her hustheT^comf*here may presume, prevails ”there— still> as persons eny b^the comí mon, laV,:!l .ca"' pot be judicially imo\vn, in the pro^Tof the law of Maryland on jjy gf^’- ‘-y not (being the ^¡fe^before the marriage) surJéaf estate'would hcite;J a.“^ aaN she had not the ^htlh(y dispose" mancipation or. otliei'wi3°-
*243 Depositions taken, as we infer, ex parte, by Tevis, in Maryland, but which were read by consent, state that the testatrix was married and lived in Maryland with her husband nearly twenty years; that, during that time, the mother of Aleck was born a slave in the family; that Mi's. Pen came to Kentucky in 1806 or 7, leaving her husband in Maryland; that she brought Aleck’s mother with her; and that they had heard, that she had abandoned her husband because he was intemperate.
On the foregoing facts the Circuit Court dismissed the bill, without prejudice, to a suit at law. And the question now to be decided, is whether that decree is right and proper.
As an executor, even before probate, may assent to a legacy, the personal representative of Mrs. Pen was not a necessary party, because the nominated executor had, by his conduct, waived any qualified or potential right which he, or any other personal representative of the testatrix, could ever have claimed to property in Aleck, or to dominion over him, for the benefit of creditors, if indeed he could ever have had any such right. We therefore perceive no defect of parties.
Nor are we prepared to concede, that a Court of Equity had not jurisdiction of the case. It has been, more than once, said by this Court, that a bill in chancery is an. appropriate mode of asserting a claim to freedom; and the Court of Appeals of Virginia had previously recognised the same doctrine. In Hudgens vs. Wrights, 1 Hen. and Mun. 133, although every inch of debatable ground seems to have been ably and obstinately contested, there was mo intimation of a doubt, from either the Bar or the Bench, respecting the jurisdiction of the Chancellor to decree on a claim to freedom, although no other ground was suggested for invoking his peculiar interposition on the merits of the case, than the hereditary, aboriginal *244 right to freedom, asserted in the bill,, as derived from a free raother.
But, without the- aid of authority or of precedent, do, not analogy and fitness furnish sufficient ground for maintaining a bill in chancery for establishing and securing the freedom of a rational being, disfranchised and subjugated by a fellow-being, to whom public opinion, the organization of society, or other accident has given the power to govern, him as á slave, and disable him from understanding or using the ordinary means of manifesting and maintaining his i;ights ?
Why does a Chancellor interpose between, guardian, and ward? or take cognizance of fraud, and dowei’, and account? Only because, from the nature of tjiose classes. ' of cases, it is prima facie probable, that the legal remedy would be inadequate, and that a disclosure on oath would be necessary to the effectuation of justice. Do not most, of the reasons which apply ill those cases signalize such a case as this? The experienced mind knows that, in such a case, an appeal to the Chancellor for his peculiar aid and guardian protection, may be much more safe and effectual than a resort to the more circumscribed discre-. tion and limited power of a Court of law; and every re-, fleeting mind must, at once, perceive more reasons than one why it is so. Moreover, as will be presently shown,. Tevis should be deemed to be a Trustee for the value of Aleck’s services, if he be a free man; and this alone would give jurisdiction. Besides, the ordinary common law remedy is indirect, and only involves, or can settle only as an incident, the essential right. And surely no kind of case can be more eminently entitled to the ex-, traordinary assistance of a Court of Equity, than one in which a man has to sue for himself, and in which- ignorance opposed by knowledge, and weakness by power, can look with some hope to the whole strength and conscience of the law alone, for protection, and justice, Actual slavery is altogether unlike any trespass on a freeman, as a freeman. We cannot therefore decide, as the Circuit Judge seems to have done, that this is not a proper case for a court of conscience. It seems to us, that a suit for freedom is a case of concurrent juris *245 diction: and we may infer, that this was the opinion of the Court of Appeals in Virginia, in the case of Dempsey vs. Lawrence, Gilmer’s Reports, 333.
Specification of-facts and eircumT) stances held suf~ ficient to establish the conclusion, that atesta-' trjx has a light to dispose of the" slaves which she' emaneipated by her will.
The next, and more important question, is whether the facts entitle the plaintiff in error to relief? And we are strongly inclined to think they do.
The counsel for the defendant has argued that, as the testatrix was a married woman before she came to Kentucky, the judicial presumption is against her right of property in the plaintiff, and that, therefore, it was necessary to the establishment of his asserted right, that he should have shown that, by the law of Maryland, or by contract, the jus disponendi belonged to her,
But, whether this fact, deemed so material, sufficient- , ,. ,, , ly appear or not, we are far from being sure that there is, in the abstract, any decisive presumption against the right of the testatrix to dispose, as she pleased, of the plaintiff: for, if we should presume, in the absence of any proof as to the law of Maryland, that the common Jaw prevails there, and that, consequently, the marital relation and rights are regulated by that code, still, we do not judicially know, that slaves, not recognised by it as property, are personal estate in Maryland, or must belong exclusively to the husband. Nor is there any reason for presuming, that the plaintiff’s mother was the property of the husband, rather than that of the wife, and which, if hers, and deemed real estate, would have survived to her after his death.
But, considering the scales as, thus far, equipoised, it is incumbent on the plaintiff to prove, affirmatively, such facts as will produce.a preponderance in his favor, And it seems to us, after a most careful and dispassionate analysis of the whole record, that he has done so, In support of this deduction, the following facts only will be considered.
First. The testatrix came to Kentucky, leaving her husband in Maryland, and bringing two slaves with her;' and she lived here about seven years as a feme sole— claiming and enjoying the slaves as her own, all the time, and without interference or question from any quarter.
*246 Second. The husband must have known that she intended to leave him, and, after she had gone, it is but reasonable to presume that he ascertained whither she had removed and where she was living: yet he never came after her, or suggested any claim to the slaves.
Third. About four years elapsed from his to her death, and nevertheless, no claim or interest was even whispered against hers.
Fourth. At the close of her life, under the most solemn sanctions, she did not seem to doubt her right to the slaves, and, calling them hers in her last will, declared that they should be free; and made careful, detailed, and provident prospective arrangements for their welfare.
Fifth. It does not appear, that she ever received or claimed any portion of her husband'1 s estate after his death.
Sixth. The persons whom she endeavored to liberate by her will, did, in fact, enjoy freedom for more than five years, without molestation, and until the defendant took them into his possession.
Seventh. There is no proof, or attempt to prove, that the defendant bought those persons, though he avers, in his answer, that he did.
Eighth. There was no administration in this state, on the estate of the husband of the testatrix, until after this suit was nearly ready for hearing; and then the defendant, self-prompted, as may be inferred, was qualified as the administrator.
Ninth. It does not appear that the intestate left any heir or legal representative, except his wife, or that there is any creditor of his estate-, and the presumption not» is, that there is no such creditor.
Tenth. Although the defendant took the depositions of the neighbors of his intestate, he did not attempt to prove? that the slaves did not, by settlement, or by law or otherwise, belong to the testatrix, or that she had no power to use and dispose of them-, nor did he prove who owned the plain-tips grand-mother at the time of his mother’s birth “in the family,” nor how, or on what terms—whether by divorce or contract—or with or without the husband’s consent or knowledge—-the final separation occurred; nor why *247 the husband did not follow his wife, or assert claim to the slaves she brought to this state as her own; nor why they were not claimed after the husband’s death, or even after that of the testatrix, for nearly six years, and then only by himself,\ under an uneslablished purchase.
Enumeration of divers distinct facts—either of which, in tlie absence of any inconsistent proofs will sustain the right of the wife,after the death of the husband, to dispose !of the slave — or (the slave being a female) her son, as the child follows the conditionofits mother
A slave freed,but required to serve for a term,- by will,is.free at the testator’s death; the subsequent service is like an apprenticeship. A deed of emancipation, though directed by the will, is not essen tial to the freedom.
In an action of trespass,brought by a colored person, for the purpose of demonstrating hÍ3 right to freedom, there can be no recovS°for hiseseryices during the timo of the unlawful detention seems'to^be'well settled as comBuTwhereaíolored person, freo righ’t'^ha^been' reduced to a con-the aggressoT^ia ving no lawful cause,°1to1°clai>m his services, will bo held accountable (as a trusitta/°value ^of thé services—reetatute^ofHmitations) to what ac years ■ofthe'sult? For the wrong & pass^and* detention (independof\be sendees”) the remedy is at law.
*247 Now, from these facts, we feel persuaded that the inference is strong, if not conclusive, that, at the time of her death, the testatrix hada right to dispose of the slaves whom she endeavored, by her will, to emancipate.
It is strongly probable, that she had that right—either because the mother was, by the local law, her’s at birth and survived to her, or because she was settled upon her, or because her husband agreed that she should take and dispose of her when she came to this State, or because she was divorced a mensa, and entitled to her as alimony, or because she was entitled to her and was permitted to hold her in consequence of her interest in her deceased husband’s estate. Any one of these hypotheses will be sufficient to sustain the plaintiff’s claim to freedom; and there is no fact in the record inconsistent, in any degree, with either of them.
It seems to us, therefore, that the facts and the law, reason, and justice, preponderate decidedly in favor of the plaintiff’s claim to freedom; and we feel it our duty to decide accordingly.
According to our interpretation of the will, the testatrix intended that the plaintiff in error should be free from the moment of her death, although he was required to serve his mother until he attained twenty-one years of age; and we are also, of the opinion that, though a deed of manumission by the executor was directed by the will, sucha document was not essential to the plaintiff’s freedom, but was prescribed only from prudential and precautionary motives.
One other question only remains: and that is, whether the plaintiff is entitled to damages for his detention, or compensation for his services. The case has been prepared with some view to this claim, and his counsel insists that it is just and legal to decree reperaticn.
*248 Upon principle or analogy, or even policy, it -would be difficult to deny that the plaintiff may have a lawful right to indemnity for an unauthorized deprivation of his liberty, and unlicensed appropriation of his constrain-ed services. There are, however, some judicial declarations tending to an opposite conclusion. But, we do , • , , , , _ not consider the question as concluded by authority. It seems that, in Virginia and Kentucky, the practice has some how obtained of withholding a judgment for dam-aSes’*n an acti°n °f trespass for trying a claim to freedom, We presume, however, that the reason for such a judic’a^ course> was 011^y because, in almost all the cases which have occurred, the defendant who failed on the ^ssue °f the liberty or slavery of the plaintiff, had acted in good faith, believing that he was his slave, and that, therefore, it was not deemed consistent with that policy which legalizes slavery, to make a citizen liable for dam- ° J , , ,. , - ages as a tresspasser, for holding as a slave a person oi serv^e c°l°r5 and not only reputed to be a slave, but taken and held as such in good faith, for a valuable or legal consideration. And thus far, we could perceive a just and consiste nt ground for maintaining the common doctrine al actions of tresspass for trying claims to freedom,
But we could not conceive any just reason for denying a iaSht to damages, in an action of tresspass by one free man against another, for a wanton subjugation to the condition of slavery. If a white man be forciblyheld as a slave does, the fact that his imprisonment was in the character and under the guise of slavery, deprive him of the right to damages for the trespass on his personal liberty ? No one can pretend that it could have an effect so unjust and preposterous. The injured party would, undoubtedly, be entitled to damages. And why should not a free colored man have an equal right to damages for forcible ab« duction, or imprisonment, or other deprivation of liberty, by a fellow being who knew that he had no semblance of legal authority for treating him as a slave, or who had forcibly held him as a slave, without probable cause? There is no difference in princple or right in the two cases : and, therefore, there should be no discrimination in the law, which only makes a certain color prima facie evr *249 den ce of slavery, but does not protect or -countenance' kidnapping.
In this plain view, we are sustained by the opinion of our predecessors in the case of Thompson vs. Wilmot (1 Bibb, 424,) in which a. decree for $>691 25* for damages, for wantonly detaining a person of color in slavery, was affirmed by this Court.
But though a person who holds a colored free man in slavery believing that he is a slave, or having probable g'rounds for so believing, may not be liable, m a trespasser, in ati action Of trespass m et urmi's, for damages for the detention, it is argued that, nevertheless, there is no good reason why, in a more appropriate procedure, hé taay not be compelled to pay as much as the actual profit Which he had derived from beneficial service; and that therefore, although the law should let him escape the punishment allotted to willful trespassers, it should not permit him to withhold that which he has actually ac¿ quired from the constrained labor of an unfortunate vicí lim of his ignorance or mistake.
There is much of the semblance, and perhaps* also* hot a little of the reality, of abstract justice in this latter position. But the practical rules of civil right-, as well as the public administration of human laws, are not only necessarily imperfect, but must, in order to attain the greatest good of the greatest number, be adapted to the condition of the aggregate society, and be modified by public policy* which may not always be consistent with speculative propriety, or perfect individual right
As legalized slavery is associated with the moral, social, and political being of Kentucky, it may be well doubted* whether the doctrine we are now considering would be perfectly congenial with our institutions, or Consistent with legal right; and there may be even more reason to doubt whether, under such institutions, it could be enforced by courts of justice, without legislative sanction. And, were it once established, either by legislation or judicial recognition, might it not disturb the repose of society, impair the value of property, and operate inconveniently, and oppressively, on honest and *250 just rrien, who, in bat conforming with the state of society, shall, in perfect integrity of motive, have used as EilaVes, arid even thereby meliorated the condition of persons who might have fallen into worse hands, and whose legal slavery had never been doubted, until—after the lapse of many years—a suit gives the first intimation of their claim to freedom? But however this may be, the common law of the State, as it has been practically understood, seems to have settled the question, in a manner sufficiently authoritative for this Court. And legislative acquiescence in the practical, and hitherto undeviating rule of conventional exemption, increases its obligation upon those whose only power is to declare, not to make, the law.
Tevis, however, has not shown, that he is entitled to exemption; for not only was Aleck in the enjoyment of freedom when he took possession of him as a slave, but there is no proof that he had any authority to claim his services, or to control him. He is therefore liable for the value of his services, as long as he has enjoyed the benefit of them—counting from the time of the decree back, not longer than five years prior to the institution ©f this suit. A Court of Equity will give no more than the profits; and if Aleck desire more, or be, in fact, entitled to damages for personal wrong, he ought, in our opinion, to have sued at law, and appealed to a jury. By profits, we of'course mean the actual value which, all things being considei’ed, Tevis derived from the services of Aleck. And, as this has not been ascertained, it will be proper, on the return of the cause to the Circuit Court, to ascertain it by agreement, or by inquiry through the instrumentality of a commissioner. The value of hire, which has been agreed, is not necessarily the true test: for it is obvious, that the actual profits may have been more or less, but most probably less, than that sutn.
Wherefore, the decree of the Circuit Court is reversed, and the cause remanded.