CHANCERY.    **White's heirs *vs* Turner, a man of color.
             Same *vs* Jonas; Same *vs* Willis.**

*Case* 44.    APPEALS FROM THE LOUISVILLE CHANCERY COURT.

*Emancipation.    Damages.    Parties.*

*December* 16.    CHIEF JUSTICE ROBERTSON delivered the Opinion of the Court.

The case stated.    THESE appeals are prosecuted for reversing three several decrees, declaring that *Jonas, Turner,* and *Willis,* men of color, and once the slaves of *Wm. White,* deceased, were emancipated by the valid last will of their said former master, alleged to have been destroyed by the heirs of the testator, after his death, and before there had been any probate thereof; and also ordering the survivors of said heirs, (one of whom was proceeded against as a non-resident,) to pay to each of the complainants $500, as the estimated value of his services.

Answers of de-
fendants & proof    The answers admit that the will was destroyed by one
in the cause.    of the testator's sons, but deny the alleged combination for that purpose, among the other heirs.    They also deny that the testator was of disposing mind; insist that they could not induce *Minor White,* (the son who destroyed the will,) to consent to the exhibition of it in the Probate Court; alleged that it provided for only an ultimate liberation, depending on contingencies which had not occurred, and on prescribed conditions, which had been violated by each of the appellees; and, to give color to this allegation, they exhibit a paper signed by all of them, about three months after the testator's death, and purporting to be a bond to the County Court of Jefferson, reciting the substance of the emancipating provision, and binding them, without proving the will, to effectuate its benevolent purposes, *as thus recited.*

But there was no attempt to prove unsoundness of mind; and the two subscribing witnesses, both of whom read or heard the will read, testified that the testator had unquestionable capacity to make a valid will, and that the one they attested contained provisions essentially differ

ent from the pretended recital in the ostensible bond, and such as entitled the appellees to be free in September, 1834. One of them also deposed, that the will having been confided to his custody by the testator, he delivered it, only a day or two after his death, to two of the heirs who were nominated as executors. The only counter-vailing evidence, was that of *one of the appellants,* whose deposition seems to have been read in the court below, without formal exception, and who affirmed that the paper before described as a bond, but which was never recog-nized by the County Court, or delivered to any person for the benefit of the appellees, truly recited the will.

In revising those decrees, we feel satisfied in concur-ring with the Chancellor, in the opinion that the will was substantially such as described by the subscribing wit-nesses, and that it was suppressed at the instance or with the connivance of all the signers of the undelivered cove-nant with the County Court.

Decree of Chan-cellor.

Why was the will not offered for probate? How did *Minor White* obtain the custody of it? Why was he per-mitted to withhold it? Where was it, from the date of its delivery to the executors, to that of the reciting document, three months afterwards? Was it destroyed before the latter date? Then the recital is false. Was it still exist-ing and transcribed? Then why was such a document pre-pared and signed by all the heirs, unless they then in-tended to suppress the will? And why was it destroyed? None of these questions have been answered, and they lead directly, and almost irresistably to the conclusions of the Chancellor, as to the contents of the will, and the combination, as charged, to suppress it for the purpose of defeating the title of the appellees and others to freedom.

All the persons thus concurring in the suppression of the will, were thereby instrumental in illegally prolonging the servitude of the appellees. And as they must be pre-sumed to have thus acted, for their own unjust profit, and with a full knowledge of the legal right of the appellees, they all subjected themselves to liability for damages, according to the principle applied by this Court in the case of *Aleck* vs *Tevis,* (4 *Dana,* 247,) and subsequently recognized and confirmed by a legislative enactment,

All persons con-cerned in sup-pressing a will, by which slaves are emancipat-ed, and in conse-quence of which they are held in servitude, are liable jointly, to a decree for dam-ages, equal to the value of their services whilst unjustly held in

WHITE'S HEIRS
vs
TURNER, &c. &c.
servitude—that
one of such per-
sons was a non-
resident, no ob-
jection to a de-
cree against him
in personam.
(*Session Acts of* 1839, *p.* 173.)   The three distributees to whom the appellees were allotted, and who have more immediately controlled them and enjoyed their services, might certainly be held, severally responsible for the value of the services as thus directly appropriated by each of them.   But the appellees are not bound to look to this individual responsibility; all those by whose combined act they were detained in slavery, after they were entitled to be free, and by whom and for whose equal benefit they were distributed, as slaves of the estate of the testator, are equally liable for having "*retained* (them) *in slavery.*"

And, according to the proof, the amount decreed, in each case, does not appear to be unreasonable; nor did the fact that one of those against whom the decrees were rendered for damages, was a non-resident, and before the Court, by constructive service only, entitle him to ex. emption from the joint decree *in personam:* being jointly liable with those who appeared and answered, the 4th section of the act of 1797, (*Statute Law,* 93,) authorized the decree against him upon publication only.

If one of sever-
al persons who
have been con-
cerned in sup-
pressing a will,
by which sup-
pression persons
of color are held
in servitude, dies
the cause of ac-
tion survives a-
gainst the repre-
sentative of such
decedent, & they
should be made
parties to a suit
for freedom, &c.
But nevertheless, we are of the opinion that the *Chancellor* erred in rendering the decrees for compensation, against the five survivors alone.   The cause of action for the value of the services, whether it be considered as arising *ex contractu* or *ex delicto,* did not die with the deceased heirs, but survived under our statute of 1812, (*Statute Law,* 88,) against their representatives; and in such a case of common liability, it is not consistent with equity to impose the whole burthen on only a part of those who should unite in bearing it.

Wherefore, the representatives of the five deceased heirs of Wm. White, who were parties in each of these cases, should have been made equally contributory with the five survivors, to the payment of the damages decreed in each case.

In the opinion of this Court, the only error in either of the decrees, is the omission to include the representatives of the deceased heirs of *Wm. White,* in the decrees for damages.

Wherefore, each of the decrees for liberation is affirmed, and each of those for damages is reversed, and the cases remanded for decrees in this last particular, in conformity with the foregoing opinion.

And there being a partial affirmance and a partial reversal, there will be no decree for costs.

*Pirtle* for appellants: *Loughborough* for appellees.